# 2009 DTA 141

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE GUAYAMA**
**PANEL XII**

BERNARDINO RUIZ DÁVILA, FELÍCITA ROJAS MARTÍNEZ, Y LA SOCIEDAD LEGAL
DE GANANCIALES COMPUESTA POR AMBOS, POR SÍ Y EN REPRESENTACIÓN DE
SUS HIJOS MENORES DE EDAD, BERNNY EMMANUEL, BERNNY JOEL Y
JESSICA JEANNETTE DE APELLIDOS RUIZ ROJAS
Apelantes

v.

AYERST-WYETH PHARMACEUTICALS, INC. Y OTROS
Apelados

Núm. KLAN-2007-00981

San Juan, Puerto Rico, a 29 de septiembre de 2009

Panel integrado por su Presidenta, la Juez Fraticelli Torres,
y los Jueces Rivera Román y Rosario Villanueva

Fraticelli Torres, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El señor Bernardino Ruiz Dávila, su esposa Felícita Rojas Martínez, por ellos y la sociedad legal de bienes gananciales que tienen constituida, y sus tres hijos menores de edad, a quienes representan en el pleito, nos solicitan la revisión de la sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Guayama, el 6 de abril de 2007. Este foro desestimó las reclamaciones por discrimen en el empleo y daños y perjuicios instadas por ellos en contra de Ayerst-Wyeth Pharmaceuticals, Inc., ex patrono del señor Ruiz Dávila, entre otros demandados.

Tras un estudio detenido del expediente del caso de autos y con el beneficio de la comparecencia de ambas partes, confirmamos la Sentencia impugnada.

Veamos los antecedentes fácticos y procesales y las normas de derecho que sirven como fundamentos de esta determinación.

### I

El señor Ruiz Dávila comenzó a trabajar como operador de empaque para la apelada Ayerst-Wyeth el 24 de octubre de 1988. Al momento de ser contratado, la compañía tenía pleno conocimiento de que él carecía de parte de su pierna izquierda, por lo que utilizaba una prótesis para caminar. Al inicio de su empleo, el señor Ruiz Dávila realizaba la mayoría de sus funciones sentado, aunque ocasionalmente trabajaba de pie. En ese

momento, la condición del apelante no limitaba de forma alguna su habilidad para completar la tareas y funciones asignadas por Ayerst-Wyeth. El señor Ruiz ocupó diversos puestos de trabajo en esa empresa, algunos de ellos en ascenso, durante los diez años que trabajó para la parte apelada.

Por un alegado accidente de trabajo, ocurrido en agosto de 1998, el señor Ruiz Dávila y su familia presentaron una demanda de daños contra Ayerst-Wyeth por violar las condiciones de acomodo razonable que le concedió al apelante, por su condición en la espalda. Alegaron que un supervisor obligó al señor Ruiz a levantar unos bidones de 80 libras de peso, que esto le provocó hernias en varios discos de su espalda, que luego lo asignaron a levantar unas cajas pesadas en el trabajo, que como consecuencia de esos dolores de espalda, desarrolló una condición de depresión por la que fue incapacitado por la Administración del Seguro Social federal. Los apelantes reclamaron a Ayerst-Wyeth una indemnización global de más de $1,500,000 por los daños sufridos por el señor Ruiz Dávila como consecuencia del alegado discrimen del que fue víctima en su lugar de trabajo.

Ayerst-Wyeth negó las alegaciones en su contra y sostuvo que brindó al apelante el acomodo razonable que requería su condición física, que las condiciones del señor Ruiz Dávila por las que reclama indemnización eran preexistentes y que nunca sometió al apelante a realizar tareas fuera de su acomodo laboral. Además, alegó que las condiciones que él padecía no estaban relacionadas con accidente o situación alguna surgida en el empleo.

Tras los procesos judiciales de rigor, el tribunal apelado celebró el juicio que se desarrolló en nueve días de vistas. Ambas partes presentaron testimonios periciales y en apoyo de sus respectivas posturas. Luego de examinar la prueba documental y de escuchar y valorar la credibilidad de los testimonios vertidos, el tribunal *a quo* desestimó en su totalidad la reclamación instada por los apelantes.

Inconforme con esa determinación, el señor Ruiz Dávila acude ante este foro y nos plantea que el tribunal *a quo* cometió los siguientes errores:

"(1) [...] en la apreciación de la prueba, al concluir que la apelada no violó el acomodo razonable del apelante Bernardino Ruiz Dávila determinando que no le fueron asignadas tareas de paletizar mientras se desempeñaba como operador de empaque, basado en el único testimonio del supervisor de la apelada, quien en su origen declaró que la función de paletizar no conllevaba levantar peso, para luego admitir al describir la tarea de paletizar, que la misma conllevaba levantar peso durante el proceso de empaque de las cajas del medicamento, siendo dicha tarea aquella por la cual se le había brindado acomodo razonable al apelante por razón de la falta de su pierna.

(2) [...] en su apreciación de la prueba al determinar que el apelante Bernardino Ruiz Dávila no acudió a trabajar durante la fecha del 8 de agosto de 1998 y que por lo tanto no ocurrió la violación al acomodo razonable; cuando surge de su propio talonario de pago (*'payroll stubb'*) que en la semana del 10 al 14 de agosto de 1998, el apelante trabajó dos días, uno de ellos únicamente 2.75 horas; cuando surge como un hecho estipulado que fue referido al dispensario de la compañía; y del expediente de personal que el apelante retornó a su trabajo el 12 de agosto y que se incapacitó desde el 13 de agosto de 1998, **siendo en esa fecha que la apelada violentó el acomodo razonable.**

(3) [...] al determinar que la apelada no violó el acomodo razonable que por tratarse de una persona con impedimento físico (amputación de una pierna) venía obligada por ley a darle al apelante; y así dictar sentencia a base de unas determinaciones que resultan contrarias a la prueba desfilada; al hacer determinaciones contradictorias [...] en contra del balance más justiciero, y de forma claramente prejuiciad[a] (*sic*) contra la parte apelante y a favor de la apelada Ayerst Wyeth."

Por estar íntimamente relacionados, discutiremos todos los señalamientos de error conjuntamente. En

síntesis, debemos resolver si el tribunal *a quo* erró al apreciar la prueba testifical y documental ofrecida por las partes durante el juicio.

## II

Con el fin de determinar si los apelantes probaron las alegaciones que sostienen sus reclamos, es necesario analizar las fuentes legales invocadas en el caso para identificar los elementos de las causas de acción que los apelantes debieron probar en el juicio. Sólo así podemos determinar si erró el Tribunal de Primera Instancia al desestimar la demanda.

## A

La Ley de Prohibición de Discrimen Contra Impedidos, Ley Núm. 44 de 2 de julio de 1985, según enmendada, 1 L.P.R.A. sec. 501 *et seq.,* fue aprobada con el fin de proteger a las personas con impedimentos físicos y mentales y ampliar sus oportunidades de desarrollo integral, particularmente mediante la prohibición del discrimen en el lugar de empleo o de estudios. *García v. Darex P.R., Inc.* 148 D.P.R. 364, 385 (1999).

La Ley Núm. 44 define persona con impedimentos físicos, mentales o sensoriales como:

"[T]oda persona con un impedimento de naturaleza motora, mental o sensorial, que le obstaculice o limite su inicio o desempeño laboral, de estudios o para el disfrute pleno de la vida y que está cualificada para llevar a cabo las funciones básicas de ese trabajo o área de estudio, con o sin acomodo razonable.

Se entenderá, además, que es una persona con impedimentos, bajo la protección de este Capítulo, toda aquella persona cuyo impedimento le limite sustancialmente su desempeño en una o más actividades del diario vivir; que la persona tenga un historial previo de esa condición; o se le considere como que tiene dicho impedimento aun cuando no lo tiene."

1 L.P.R.A. sec. 501(d).

La Ley Núm. 44 establece la obligación del patrono de proveer acomodo razonable en el lugar de trabajo y de asegurar que las personas con impedimentos cualificadas se les permita trabajar al máximo de su productividad, excepto cuando demuestre que tal acomodo razonable es un esfuerzo extremadamente oneroso en términos económicos para la empresa. Así lo establece el Artículo 9 de la ley, 1 L.P.R.A. sec. 507(a), que fue añadido por la Ley Núm. 105 de 20 de diciembre de 1991, con el propósito de ajustar la Ley 44 a la Americans With Disabilities Act (ADA), 42 U.S.C. secs. 12101 *et seq.* Véase *Ríos v. Cidra Mfg. Oper. of P.R. Inc.,* 145 D. P.R. 746, 749 (1998); *Rivera Flores v. Compañía ABC H/N/C McGaw of P.R. Inc.*, 138 D.P.R. 1, 5 (1995).

La Ley Núm. 44 define el concepto de acomodo razonable como:

"[…] el ajuste lógico adecuado o razonable que permite o faculta a una persona cualificada para el trabajo, con limitaciones físicas, mentales o sensoriales, ejecutar o desempeñar las labores asignadas a una descripción o definición ocupacional. Incluye ajustes en el área de trabajo, construcción de facilidades físicas, adquisición de equipo especializado, proveer lectores, ayudantes, conductores e intérpretes y cualquier otra acción que razonablemente le facilite el ajuste a una persona con limitaciones físicas, mentales o sensoriales en su trabajo y que no represente un esfuerzo extremadamente oneroso en términos económicos.

Significará, además, la adaptación, modificación, medida o ajuste adecuado o apropiado que deben llevar a cabo las instituciones privadas y públicas para permitirle o facultarle a la persona con impedimentos cualificada a participar en la sociedad a integrarse a ella en todos los aspectos inclusive, trabajo, instrucción, educación, transportación, vivienda, recreación y adquisición de bienes y servicios."

1 L.P.R.A. sec. 501(b).

El Tribunal Supremo de Puerto Rico ha expresado que para que un empleado esté cobijado por la Ley Núm. 44 y su patrono esté obligado a brindarle acomodo razonable, el empleado tendrá que demostrar que es una persona con impedimento, según lo define la ley, y que está cualificado para llevar a cabo las funciones básicas de ese trabajo, con o sin el acomodo razonable. 1 L.P.R.A. sec. 501(d); *García Díaz v. Darex Puerto Rico*, 148 D.P.R., a las págs. 385-386.

La persona que ha sufrido un discrimen en el empleo por razón de su impedimento, en clara violación de las disposiciones de la Ley Núm. 44, tendrá también disponibles la autoridad y los remedios, facultades y procedimientos establecidos en ciertas secciones de la Ley Núm. 100 de 30 de junio de 1959, 29 L.P.R.A. sec. 146 *et seq*. Así lo permitió la Ley Núm. 53 de 30 de agosto de 1992 y quedó plasmado en el Artículo 13 de la Ley Núm. 44, 1 L.P.R.A. sec 511. *Rivera Flores v. Compañía ABC H/N/C McGaw of P.R. Inc.*, 138 D.P.R., a la pág. 5.

Por ejemplo, el Artículo 3 de la Ley Núm. 100 establece una presunción controvertible de discrimen. A esos efectos, se considera que los actos discriminatorios por razón de edad, raza, color, religión, sexo, origen social o nacional o condición social se cometieron en violación de la ley, salvo que el patrono demuestre que hubo justa causa para el acto impugnado. 29 L.P.R.A. sec. 148. Es decir, si una persona alega que ha sido discriminada por razón de impedimento al amparo de la Ley Núm. 44, le aplicarán las presunciones de discrimen contenidas en la Ley Núm. 100. *S.L.G. Hernández-Beltrán v. TOLIC*, 151 D.P.R. 754, 774 (2000).

No obstante, "esa presunción entra en juego en la etapa probatoria del caso, es decir, que la presunción se activa en la vista evidenciaria que se celebre, no antes". *S.L.G. Hernández-Beltrán v. TOLIC*, 151 D.P.R., a la pág. 774. De ahí que esa presunción no altera el esquema probatorio que prevalece en nuestra jurisdicción, en que le corresponde a la parte demandante presentar, en primer lugar, la prueba de su reclamación, antes de que la parte demandada venga obligada a rebatirla. *Id.*

La parte demandante debe, pues, presentar prueba que demuestre: (1) que hubo un despido *o acto perjudicial*; (2) que ese acto se realizó sin justa causa; y (3) que ese acto perjudicial cae dentro de la modalidad de discrimen bajo la cual reclama.

Luego que la parte demandante cumpla con esa primera fase, entonces surge la presunción de discrimen y el peso de la prueba cambia y recae en el patrono. En el caso en que el patrono no presente prueba alguna, el empleado prevalecería en su reclamación. Por el contrario, si el patrono decide defenderse, puede presentar prueba que rebata la presunción de discrimen activada por el empleado. *S.L.G. Hernández-Beltrán v. TOLIC*, 151 D.P.R., a la pág. 775.

## B

Por otro lado, los parientes de la persona con impedimentos no pueden reclamar al patrono indemnización por sus daños por virtud de las Leyes 44 y 100, pero pueden hacerlo al amparo del Artículo 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141. Así se ha resuelto reiteradamente por la jurisprudencia:

"Los derechos de los parientes de los obreros no son un apéndice del contrato laboral ni emanan supletoriamente o de modo alguno de la referida legislación especial, por lo que no procede acudir a ella para decidir si los parientes de los obreros tienen determinados derechos o no. [Nota omitida.] Los derechos de los parientes, en casos como el de marras, constituyen una normativa independiente que surge por su propia cuenta al amparo del Art. 1802 del Código Civil, conforme a los principios generales de la responsabilidad extracontractual. Es a esos principios y a ese Artículo a lo que hay que acudir como fuentes de derecho, al dilucidar la situación jurídica del pariente del obrero."

*Santini Rivera v. Serv. Air Inc.*, 137 D.P.R. 1, 5-6 (1994). Véase también a *Dorante v. Wrangler de Puerto Rico*, 145 D.P.R. 408, 434 (2001); *Maldonado Rodríguez v. Banco Central*, 138 D.P.R. 268, 274 (1995).

Conforme a los principios fundamentales de la responsabilidad civil extracontractual, de probar los familiares del empleado discriminado que: (1) han sufrido un daño moral compensable; (2) que ese daño fue causado por el trato discriminatorio que el patrono impartió al empleado, con quien los reclamantes están vinculados por lazos de parentesco, afecto y cariño, de modo tal que el impacto del trato discriminatorio sobre el empleado les causó perjuicio, y (3) el acto del patrono fue culposo, entonces, surge para ellos una causa de acción resarcible. Código Civil de Puerto Rico, Art. 1802, ya citado. Véase, además, *Santini Rivera v. Serv. Air Inc.*, 137 D.P.R., a las págs. 6-11; *Hernández v. Fournier*, 80 D.P.R. 93, 96 (1957); Herminio Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico*, 58 (2da. Ed., **Publicaciones JTS**, 1986); José Cuevas Segarra, *La Responsabilidad Civil y el Daño Extra-contractual en Puerto Rico* 82 (1ra. Ed., **Publicaciones JTS**, 1993).

Apliquemos esta normativa al caso de autos.

### III

Por el alegado accidente de trabajo, ocurrido en agosto de 1998, los apelantes presentaron la demanda de daños que nos ocupa en junio de 1999. Alegaron que el 8 de agosto de 1998, la compañía violó las condiciones del acomodo razonable que le había otorgado al señor Ruiz Dávila, por su condición en la espalda, cuando lo obligaron a levantar unos bidones de 80 libras cada uno; que esto le provocó hernias en varios discos de su espalda; que un médico le ordenó mantenerse en descaso sin reportarse a trabajar; que tuvo que volver a trabajar y **el 8 de agosto de 1998** lo asignaron a levantar unas cajas pesadas en el trabajo, por lo que desarrolló una condición de depresión como consecuencia de los dolores de espalda, lo que eventualmente resultó en la determinación de incapacidad de la Administración del Seguro Social federal. Por esos daños los apelantes reclamaron la indemnización de más de $1,500,000.

Tras los procesos judiciales de rigor, el Tribunal de Primera Instancia celebró el juicio del caso de autos los días 10 al 13 de marzo, el 30 de septiembre, del 1 al 3 de octubre y el 14 de noviembre de 2003. Los apelantes presentaron los testimonios del señor Ruiz Dávila, de la señora Rojas Martínez y de sus 3 hijos demandantes. Además, presentaron el testimonio pericial del psiquiatra Guillermo de Hoyos. Ayerst-Wyeth presentó los testimonios del señor Martín Ortiz, Director de Recursos Humanos; el señor José García, supervisor del señor Ruiz Dávila; el señor Juan Reynés, Director de la Unidad de Contraceptivos Orales; y la psicóloga Carol Romey.

Después de examinar con detenimiento la transcripción de la prueba oral, los autos originales y los escritos de ambas partes, podemos concluir que las determinaciones de hechos formuladas por el Tribunal de Primera Instancia, salvo discrepancias menores, se sostienen en la prueba presentada y admitida en el juicio. Los hechos más relevantes para atender los señalamientos de error que contiene la apelación son los siguientes.

Desde que el señor Ruiz Dávila comenzó a trabajar como operador de empaque para Ayerst-Wyeth en 1988, **[1]** ya tenía una condición física que lo cualificaba como persona con impedimento, pues la compañía sabía que utilizaba una prótesis para caminar. **[2]** Al inicio de su empleo, la condición del apelante no limitaba de forma alguna su capacidad para realizar y completar las tareas y funciones que se le asignaban en las instalaciones de Ayerst-Wyeth. **[3]** Entre las tareas que el señor Ruiz Dávila realizaba en el área de empaque estaba la de "paletizar", **[4]** que "...consiste en llenar las cajas con el producto y ponerlas en una paleta" que luego sería recogida por un "finger" de inspección, de "rework" y de "line control". **[5]**

En 1994, el señor Ruiz Dávila solicitó a su patrono que lo ascendiera al puesto de operador de materiales ('*material handler*') en el área del almacén. **[6]** En agosto de ese mismo año, el señor Ruiz Dávila acudió al Fondo del Seguro del Estado (el Fondo) para recibir tratamiento debido a unos fuertes dolores de espalda. El

Fondo no relacionó el caso con el empleo y determinó que la causa de esos dolores era que el apelante utilizaba una prótesis más grande de la que necesitaba. **[7]** El señor Ruiz Dávila desarrolló dolores en la región lumbar, espasmos musculares y discos herniados en las vértebras L4-L5 y debido a estas condiciones comenzó a ausentarse continuamente de su empleo. **[8]**

El 20 de diciembre de 1996, el apelante solicitó **por primera vez** acomodo razonable en la empresa, según le fue recomendado por su ortopeda, el doctor Juan Bertrán. Este médico recomendó que el señor Ruiz Dávila fuera transferido a un puesto en el que no tuviera que levantar objetos que pesaran más de 25 libras y donde pudiera conducir el "finger lift" sentado. **[9]** Ayerst-Wyeth atendió la petición y reubicó al apelante al puesto de operador de empaque en la división de contraceptivos orales. Surge de autos que el señor Ruiz Dávila estuvo de acuerdo con el acomodo razonable que le ofreció su patrono. **[10]**

Las funciones del señor Ruiz Dávila en su nuevo puesto como operador de empaque en la división de contraceptivos orales se limitaban a observar cuidadosamente el proceso de empaque automatizado del producto e intervenir si ocurría alguna irregularidad en el funcionamiento de la máquina para corregirla. El supervisor del señor Ruiz Dávila, José García, no le asignó en momento alguno tareas que requirieran levantar objetos pesados. **[11]**

El señor Ruiz Dávila trabajó su jornada regular de 8 horas desde el lunes 3 hasta el miércoles, 5 de agosto del 1998 sin informarle a su patrón o a su supervisor que sufrió algún accidente en el lugar de trabajo. No obstante, se ausentó el día siguiente, el jueves, 6 de agosto, y luego presentó un certificado médico en el que el doctor Amadeo Tauler le ordenó que descansara desde el jueves, 6 de agosto de 1998 hasta el lunes, 10 de agosto del mismo año, por su condición de *radiculitis* en el área lumbar. **[12] El señor Ruiz Dávila no trabajaba los fines de semana, por lo que no tenía que ir, ni fue a trabajar el sábado, 8 de agosto de 1998. [13]**

El 10 de agosto, el señor Ruiz Dávila presentó otro certificado médico. En éste, el doctor Jorge Torres ordenó que se mantuviera en descanso hasta el día siguiente, el martes, 11 de agosto de 1998. **[14]** El apelante se reintegró a sus labores el miércoles, 12 de agosto, y trabajó su jornada completa. No reportó accidente alguno en su área de trabajo al patrono ni a su supervisor. El 13 de agosto, el señor Ruiz Dávila presentó nuevamente otro certificado médico del doctor Torres para excusarlo de su empleo durante el período del 13 al 23 de agosto de 1998. **[15]** Este médico indicó en el certificado que su paciente padecía de trastorno de tensión (*'stress disorder'*) y depresión mayor.

El 21 de agosto de 1998, el señor Ruiz Dávila le envió a Ayerst-Wyeth otro certificado médico en el que el doctor Monasterio extendió su período de descanso hasta el 28 de agosto del mismo año. El último día de esa nueva licencia por enfermedad, la señora Rojas Martínez, esposa de Ruiz Dávila, sufrió una caída en la que se fracturó la espina dorsal. Tuvo que ser hospitalizada en el Centro Médico en Río Piedras y en el Ashford Presbyterian Community Hospital en Santurce. El 29 de agosto de 1998, el señor Ruiz Dávila presentó otro certificado médico, suscrito esta vez por el doctor Luis A. Torrado, en el cual se le extendió su licencia por enfermedad hasta el 31 de octubre del mismo año. **[16]**

Durante el mes de septiembre de 1998, el señor Ruiz Dávila viajó todos los días desde Coamo hasta San Juan para visitar a su esposa, la señora Rojas Martínez. Luego de que ella dejara el hospital, él y su suegra se encargaron de atender las necesidades de la señora Rojas Martínez. **[17]** Posteriormente, el señor Ruiz Dávila le solicitó a Ayerst-Wyeth que le concediera los **beneficios por incapacidad a corto plazo**, por causa de una incapacidad que comenzó **el sábado, 8 de agosto de 1998**. **[18]** Esta solicitud fue suscrita por el doctor Torrado, **pero éste indicó en ella que las condiciones médicas del apelante y el alegado accidente no estaban relacionados con su empleo en Ayerst-Wyeth**. **[19]**

El 22 de octubre de 1998, el señor Ruiz Dávila nuevamente acudió al Fondo a buscar tratamiento para su condición de la espalda y para su condición emocional. En ese momento alegó que ambas condiciones estaban relacionadas con un accidente que aconteció el 8 de agosto del mismo año. Además, alegó que el accidente ocurrió al levantar unos bidones de 40 libras cada uno. [20] Ayerst-Wyeth le solicitó al Fondo una investigación del accidente, pero la agencia nunca la realizó. [21]

El Fondo ordenó un período de descanso para el señor Ruiz Dávila y determinó que su condición emocional surgió como consecuencia de su condición física. El Fondo dio de alta al señor Ruiz Dávila por su condición emocional el 15 de abril de 1999. Posteriormente, lo dio de alta el 19 de mayo del mismo año por su condición física. **Aún cuando se encontraba dentro del período de reserva de empleo, el señor Ruiz Dávila nunca le solicitó a Ayerst-Wyeth que lo reintegrara a su puesto. [22]**

De la prueba testifical y documental que hemos examinado no surge evidencia preponderante que demuestre el alegado incumplimiento del patrono con su obligación de acomodo razonable hacia el señor Ruiz Dávila. En síntesis, el señor Ruiz Dávila debió presentar prueba en el juicio para demostrar el acto perjudicial por parte de su patrono; que ese acto fue injustificado; y que tal actuación cae dentro de la modalidad de discrimen bajo la cual reclamó, en este caso, la falta de un acomodo razonable continuo y efectivo, por razón de su imposibilidad de levantar objetos con más de cierto peso.

Desde el momento en que el señor Ruiz Dávila solicitó el acomodo razonable en su empleo, mediante la presentación de un certificado médico que recomendaba que se le transfiriera a un puesto en el que no tuviera que levantar objetos que pesaran más de 25 libras y donde pudiera trabajar sentado, Ayerst-Wyeth lo reasignó al área de empaque. [23] En esta división, el señor Ruiz Dávila realizaba diversas tareas en las que podía estar sentado o parado, según su preferencia. [24]

El señor Ruiz Dávila no presentó prueba convincente para el Tribunal de Primera Instancia que demostrara que, luego de obtener el acomodo razonable solicitado, se incumplió con él. Tampoco desfiló prueba que demostrara el peso de la caja o de las cajas o bidones que el señor Ruiz Dávila alega que tuvo que levantar por órdenes de su supervisor. De hecho, su testimonio sobre esta secuencia de hechos tuvo varias inconsistencias. [25] No obstante, de la prueba admitida en el juicio surge que en la fecha en que según el señor Ruiz Dávila ocurrió el accidente, el sábado, 8 de agosto de 1998, él estaba en reposo. Así lo acredita una certificación médica. [26] Además, el señor Ruiz Dávila no trabajaba los fines de semana y admitió en sus declaraciones que se equivocó al señalar esa fecha, pero no pudo recordar el momento preciso que permitiera corroborar lo alegado por él. [27]

Tampoco demostró el apelante la conducta discriminatoria por razón de su impedimento de parte del patrono. Según quedó demostrado en el juicio, Ayerst-Wyeth le proveyó al señor Ruiz Dávila un empleo, consciente de que él tenía una amputación, [28] le proporcionó un seguro medico que cubrió los gastos de sus prótesis en varias ocasiones, [29] le concedió los dos ascensos que solicitó [30] y le proveyó el acomodo razonable cuando el señor Ruiz Dávila lo requirió. [31]

Si aceptamos, para efectos del análisis, que el señor Ruiz Dávila probó un acto perjudicial por parte de su patrono que activó la presunción de discrimen, el patrono en este caso presentó prueba suficiente y preponderante para rebatir las alegaciones de violación al acomodo razonable y discrimen en el empleo. Ayerst-Wyeth demostró, mediante el testimonio de sus empleados y las estipulaciones de las partes, que cumplió con los procedimientos de acomodo razonable que exige la ley. [32] También probó, mediante el testimonio del supervisor Juan García, que al señor Ruiz Dávila no se le asignaron funciones que violentaran el acomodo. El señor García declaró que las tareas que se asignaban a los operadores de empaque no requerían el levantamiento de peso y éste era el puesto que ocupaba el señor Ruiz Dávila para la fecha del alegado accidente. [33] Al darle credibilidad a este testimonio sobre el testimonio del señor Ruiz Dávila, el foro sentenciador inclinó el peso de

la preponderancia de la prueba a favor de Ayerst-Wyeth. No podemos intervenir con ese juicio.

Además, la prueba pericial no ató las condiciones del señor Ruiz Dávila a un acto impropio, culposo o negligente del patrono, como tampoco lo hizo ninguno de los testigos que declararon en el juicio. Ausente el acto culposo o negligente del patrono, no hay daño compensable alguno bajo ninguna de las fuentes legales reseñadas.

En lo que respecta a los familiares del señor Ruiz Dávila, éstos necesitaban demostrar la ocurrencia del acto u omisión culposa o negligente del patrono, consistente en no honrar el acomodo razonable que debía a su pariente; la realidad del daño sufrido por él, consistente en los efectos físicos y emocionales que alega en la demanda; y el nexo causal entre esos daños y la actuación patronal. En el caso de autos no se probó la conducta discriminatoria del patrono Ayerst-Wyeth ni se demostró hecho adicional alguno que fundamentara su causa de acción bajo el Artículo 1802 del Código Civil.

Recordemos que, de ordinario los foros apelativos no intervienen con la apreciación particular que hacen los foros primarios de la credibilidad de los testigos ni de la apreciación de la prueba oral presentada y admitida en un juicio. Sólo intervenimos con esa facultad cuando se nos demuestra que el foro primario actuó con pasión, prejuicio o parcialidad, o si dicho foro cometió un error manifiesto al aquilatarla. Véase, *Meléndez v. Caribbean Int'l News*, 151 D.P.R. 649, 664; *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139, 152 (1996).

Es indiscutible que, siendo el juez de instancia quien tuvo la oportunidad de escuchar y de ver a los testigos mientras ofrecían sus declaraciones, sea ese juzgador quien se encuentra en mejor posición para valorar esa prueba. Esta regla general de deferencia existe en consideración a que a nivel apelativo, de ordinario, "...sólo tenemos récords [...] mudos e inexpresivos". *Pérez Cruz v. Hospital La Concepción*, 115 D.P.R. 721, 728 (1984).

En fin, los argumentos presentados por los apelantes no nos persuaden para intervenir con la apreciación de la prueba efectuada por el tribunal *a quo*. Resolvemos que nuestra intervención con su criterio sería arbitraria e injustificada. El tribunal apelado no erró al desestimar la demanda instada por los apelantes en contra de Ayerst-Wyeth, al amparo de la Ley Núm. 44, la Ley Núm. 100 o el Artículo 1802 del Código Civil de Puerto Rico, ya citados.

## IV

Ahora bien, ante el cuadro fáctico reseñado, ¿tenía el señor Ruiz algún remedio al amparo de otra legislación laboral?

Los tribunales debemos garantizar que los litigantes reciban los remedios a los que tienen derecho. Regla 70 de Procedimiento Civil, 31 L.P.R.A. Ap. III, R. 70. Hemos examinado la Ley de Compensaciones por Accidentes del Trabajo, Ley Núm. 83 de 29 de octubre de 1992 según enmendada, 11 L.P.R.A. sec. 1 *et seq.*, con el fin de indagar si el apelante tiene algún remedio al amparo de esa legislación.

La Ley de Compensaciones por Accidentes del Trabajo es un estatuto con fines reparadores que establece un sistema de seguro compulsorio y exclusivo para compensar a los obreros y empleados que sufran lesiones, se inutilicen o mueran como consecuencia de accidentes ocurridos en sus trabajos. El Artículo 5-A de esta ley garantiza al obrero que se inhabilita temporalmente, como consecuencia de un accidente o enfermedad ocupacional, cierta "tranquilidad de espíritu", en la medida en que le impone al patrono la obligación de reinstalarlo en su empleo, siempre que cumpla los requisitos que impone la propia Ley. **[34]** 11 L.P.R.A. sec. 7; *Rodríguez v. Méndez & Co.*, 147 D.P.R. 734, 745 (1999).

El Tribunal Supremo de Puerto Rico ha determinado que, a los fines de la Ley de Compensaciones por

Accidentes del Trabajo, el accidente compensable es aquél que cumple con los siguientes requisitos: (a) que provenga de cualquier acto o función del obrero; (b) que sea inherente al trabajo o empleo del obrero; y (c) que ocurra en el curso de éste. *Lebrón Bonilla v. E.L.A.*, 155 D.P.R. 475, 484 (2001); *Ortiz Pérez v. F.S.E.*, 137 D.P.R. 367, 373 (1994); *Admor., F.S.E. v. Comisión Industrial*, 101 D.P.R. 56, 58 (1973).

En el caso de autos, cuando en 1998, el señor Ruiz Dávila reclamó beneficios por segunda vez al Fondo, éste le relacionó las condiciones físicas sobrevenidas en esa segunda ocasión con su empleo, a pesar de que la agencia no realizó investigación alguna sobre los alegados hechos y de que no se demostró la fecha en que ocurrió el alegado accidente.

Ayerst-Wyeth tenía que reservar el empleo al señor Ruiz Dávila por el plazo de un año, desde la ocurrencia del alegado accidente que lo incapacitó. No obstante, luego de la determinación del Fondo y después de recibir tratamiento y de obtener el alta para sus dos condiciones, física y emocional, el señor Ruiz Dávila no solicitó a su patrono la reinstalación a su puesto de trabajo en el aludido plazo, al amparo del Artículo 5-A de la Ley de Compensaciones por Accidentes del Trabajo. Ante las circunstancias descritas, el señor Ruiz Dávila tampoco tiene derecho a este remedio laboral.

Procede la confirmación de la sentencia apelada.

## V

Por los fundamentos expresados, confirmamos la sentencia apelada, sin imposición alguna de honorarios de abogado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones

## ESCOLIOS 2009 DTA 141

**1.** Véase, Notificación de Ayerst-Wyeth de 20 de octubre de 1988, Apéndice del Recurso, pág. 118; Estipulación de partes número 1 del Informe de Conferencia con Antelación al Juicio, Apéndice del recurso, pág. 33.

**2.** Véase, Estipulación de partes números 3 y 4 del Informe de Conferencia con Antelación al Juicio, Apéndice del recurso, pág. 34. Durante el período de tiempo que el señor Ruiz Dávila trabajó para Ayerst-Wyeth, la compañía asumió en tres ocasiones distintas el costo de reemplazo de la prótesis que él utilizaba, en los años 1990, 1993 y 1994. Apéndice del Recurso, págs. 179-190.

**3.** Véase, Transcripción de la Prueba Oral (T.P.O.) de 10 de marzo de 2003, págs. 73-74 y 89; Sentencia, Determinación de Hechos número 6, Apéndice del recurso, pág. 52.

**4.** Véase, Estipulación de partes número 5 y 6 del Informe de Conferencia con Antelación al Juicio, Apéndice del recurso, pág. 34.

**5.** Véase, Estipulación de partes número 6 del Informe de Conferencia con Antelación al Juicio, Apéndice del Recurso, pág. 34.

**6.** Véase, T.P.O. de 10 de marzo de 2003, pág. 88; Estipulación de partes número 8 del Informe de Conferencia con Antelación al Juicio, Apéndice del recurso, pág. 34.

**7.** Véase, T.P.O. de 11 de marzo de 2003, pág. 9; Estipulación de partes números 10, 11 y 12 del Informe de Conferencia con Antelación al Juicio, Apéndice del recurso, pág. 34. De los documentos admitidos como prueba surge que la

reclamación del Fondo realizada en agosto del 1994 se debió a un dolor en la cadera, luego de manipular un "dron" de medicamento. El Fondo determinó que el cuadro de dolor en la cadera derecha se debía al continuo esfuerzo de la articulación durante su marcha, puesto que utilizaba una prótesis muy grande. Véase, Informe médico especial del Fondo, Apéndice del recurso, pág. 400. Además determinó que el señor Ruiz Dávila no sufrió un accidente del trabajo ni enfermedad ocupacional alguna. Véase, Decisión del Administrador, Apéndice del recurso, pág. 404.

**8.** Véase, T.P.O. de 11 de marzo de 2003, págs. 12-13. El apelante se ausentó de su empleo 16 veces durante el año 1996. Asimismo, se ausentó 29 veces en 1997 y 15 veces en 1998. Sentencia, Determinaciones de Hechos número 17 y 56, Apéndice del recurso, págs. 54 y 59.

**9.** Véase, Certificado médico del doctor Juan M. Bertrán, Apéndice del Recurso, pág. 527.

**10.** Véase, T.P.O. de 11 de marzo de 2003, pág. 14; Sentencia, Determinación de Hechos número 21, Apéndice del recurso, pág. 54.

**11.** Véase, T.P.O. de 3 de octubre de 2003, págs. 36-46; Sentencia, Determinación de Hechos número 50, Apéndice del recurso, pág. 59.

**12.** Véase, Referido médico de 6 de agosto de 1998, Apéndice del Recurso, pág. 580.

**13.** Véase, Sentencia, Determinación de Hechos número 59, Apéndice del recurso, pág. 60.

**14.** Véase, Certificado de incapacidad del 11 de agosto de 1998, Apéndice del Recurso, pág. 580.

**15.** Véase, Certificado médico de 8 de agosto de 1998, Apéndice del recurso, pág. 582; Sentencia, Determinaciones de Hechos número 60-64, Apéndice del recurso, pág. 60.

**16.** Véase, Certificación médica, 29 de agosto de 1998, Apéndice de la parte demandada, pág. 63; Sentencia, Determinaciones de Hechos número 65-67, Apéndice del recurso, págs. 60-61.

**17.** Véase, T.P.O. de 11 de marzo de 2003, págs. 69-72; Sentencia, Determinaciones de Hechos número 68, Apéndice del recurso, pág. 61.

**18.** Véase, Reclamo de incapacidad, Apéndice del recurso, pág. 206; Sentencia, Determinación de Hechos número 73, Apéndice del recurso, pág. 61.

**19.** Véase, Reclamo de incapacidad, Apéndice del recurso, pág. 206; Sentencia, Determinación de Hechos número 74, Apéndice del recurso, pág. 61.

**20.** Véase, Informe médico de 22 de octubre de 1998, Apéndice del recurso, pág. 465.

**21.** Véase, Sentencia, Determinaciones de Hechos números 77-78, Apéndice del recurso, págs. 61-62.

**22.** Véase, Estipulación de partes número 33, Apéndice del recurso, pág. 36; T.P.O. de 10 de marzo de 2003, pág. 65; Sentencia, Determinaciones de Hechos números 79-83, Apéndice del recurso, pág. 62.

**23.** Véase, T.P.O. de 10 de marzo de 2003, págs. 49-50. Previo a este momento, el señor Ruiz admitió varias veces que no tenía ninguna necesidad médica y que estaba perfectamente bien. Véase T.P.O. de 10 de marzo de 2003, págs. 89-90.

**24.** Véase, T.P.O. de 2 de octubre de 2003, pág. 22.

**25.** En su testimonio, el señor Ruiz Dávila hizo referencia a que cargó una caja con 600 tabletas de Triphasil; sin embargo, en la declaración jurada que prestó en un momento más cercano a la fecha en que ocurrieron los alegados hechos, se refirió a 500 tabletas. Tampoco describió con detalle la tarea que alegadamente tenía asignada el día en que ocurrieron los alegados hechos. Véase T.P.O. de 11 de marzo de 2003, págs. 97-99. De todos modos, nunca se pesó la caja de 600

tabletas que alegó que había cargado con el propósito de presentar ese peso en evidencia.

**26.** Véase, Referido médico, 6 de agosto de 1998, Apéndice del recurso, pág. 580.

**27.** Véase, T.P.O. de 11 de marzo de 2003, pág. 39.

**28.** Véase, T.P.O. de 10 de marzo del 2003, págs. 72-73.

**29.** Véase, Documentación sobre las autorizaciones del plan médico referentes a las prótesis, Apéndice del recurso, págs. 179-190.

**30.** Véase, T.P.O. de 10 de marzo de 2003, pág. 88.

**31.** Véase, T.P.O. de 11 de marzo de 2003, pág. 14.

**32.** Las estipulaciones número 18, 19 y 20 del Informe de Conferencia con Antelación a Juicio demuestran que el Dr. Bertrán recomendó un acomodo razonable mediante certificación para cambiar el área de trabajo del señor Ruiz Dávila y conforme a estas instrucciones reasignaron al señor Ruiz Dávila al área de empaque. Véase, Apéndice del recurso, pág. 35.

**33.** Véase, T.P.O. de 3 de octubre de 2003, pág. 36. El señor García declaró que la posición de "pack off", tarea que no le asignaron al señor Ruiz Dávila, requería atributos adicionales que no tenían necesariamente los operadores de empaque y que el señor Ruiz Dávila no tenía, tales como rapidez, hacer fuerza, mover paletas, empujar, halar, entre otras funciones. Véase, T.P.O. de 3 de octubre de 1998, págs. 44-45.

**34.** El Artículo 5-A de la Ley de Compensaciones por Accidentes del Trabajo dispone como sigue:

"En los casos de inhabilitación para el trabajo de acuerdo con las disposiciones de este Capítulo, el patrono vendrá obligado a reservar el empleo que desempeñaba el obrero o empleado al momento de ocurrir el accidente y a reinstalarlo en el mismo, sujeto a las siguientes condiciones:

(1) que el obrero o empleado requiera al patrono que lo reponga en su empleo dentro del término de quince días, contados a partir de la fecha en que el obrero o empleado fuere dado de alta, y siempre y cuando dicho requerimiento no se haga después de transcurrido doce meses desde la fecha del accidente;

(2) que el obrero o empleado esté mental y físicamente capacitado para ocupar dicho empleo en el momento en que solicite del patrono su reposición, y

(3) que dicho empleo subsista en el momento en que el obrero o empleado solicite su reposición. (Se entenderá que el empleo subsiste cuando el mismo está vacante o lo ocupe otro obrero o empleado. Se presumirá que el empleo estaba vacante cuando el mismo fuere cubierto por otro obrero o empleado dentro de los treinta días siguientes a la fecha en que se hizo el requerimiento de reposición.)

Si el patrono no cumpliere con las disposiciones de esta sección, vendrá obligado a pagar al obrero o empleado o a sus beneficiarios los salarios que dicho obrero o empleado hubiere devengado de haber sido reinstalado, además le responderá de todos los daños y perjuicios que le haya ocasionado. [...]."